(Slip Opinion) OCTOBER TERM, 2011 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## RADLAX GATEWAY HOTEL, LLC, ET AL. *v.* AMALGAMATED BANK

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

No. 11–166.   Argued April 23, 2012—Decided May 29, 2012

To finance the purchase of a commercial property and associated renovation and construction costs, petitioners (debtors) obtained a secured loan from an investment fund, for which respondent (Bank) serves as trustee.  The debtors ultimately became insolvent, and sought relief under Chapter 11 of the Bankruptcy Code.  Pursuant to 11 U. S. C. §1129(b)(2)(A), the debtors sought to confirm a "cramdown" bankruptcy plan over the Bank's objection.  That plan proposed selling substantially all of the debtors' property at an auction, and using the sale proceeds to repay the Bank.  Under the debtors' proposed auction procedures, the Bank would not be permitted to bid for the property using the debt it is owed to offset the purchase price, a practice known as "credit-bidding."  The Bankruptcy Court denied the debtors' request, concluding that the auction procedures did not comply with §1129(b)(2)(A)'s requirements for cramdown plans.  The Seventh Circuit affirmed, holding that §1129(b)(2)(A) does not permit debtors to sell an encumbered asset free and clear of a lien without permitting the lienholder to credit-bid.

*Held:* The debtors may not obtain confirmation of a Chapter 11 cramdown plan that provides for the sale of collateral free and clear of the Bank's lien, but does not permit the Bank to credit-bid at the sale.  Pp. 3–10.

(a) A Chapter 11 plan proposed over the objection of a "class of secured claims" must meet one of three requirements in order to be deemed "fair and equitable," and therefore confirmable.  The secured creditor may retain its lien on the property and receive deferred cash payments, §1129(b)(2)(A)(i); the debtors may sell the property free and clear of the lien, "subject to section 363(k)"—which permits the

Syllabus

creditor to credit-bid at the sale—and provide the creditor with a lien on the sale proceeds, §1129(b)(2)(A)(ii); or the plan may provide the secured creditor with the "indubitable equivalent" of its claim, §1129(b)(2)(A)(iii).

Here, the debtors proposed to sell their property free and clear of the Bank's liens and repay the Bank with the sale proceeds, as contemplated by clause (ii). Because the debtors' auction procedures do not permit the Bank to credit-bid, however, the proposed sale cannot satisfy the requirements of clause (ii). The debtors claim their plan can instead satisfy clause (iii) by providing the Bank with the "indubitable equivalent" of its secured claim, in the form of cash generated by the auction.

The debtors' reading of §1129(b)(2)(A), under which clause (iii) permits precisely what clause (ii) proscribes, is hyperliteral and contrary to common sense. "[I]t is a commonplace of statutory construction that the specific governs the general." *Morales* v. *Trans World Airlines, Inc.*, 504 U. S. 374, 384. Here, where general and specific authorizations exist side-by-side, the general/specific canon avoids rendering superfluous a specific provision that is swallowed by the general one. See *D. Ginsberg & Sons, Inc.* v. *Popkin*, 285 U. S. 204, 208. As applied to §1129(b)(2)(A), the canon provides that the "general language" of clause (iii), "although broad enough to include it, will not be held to apply to a matter specifically dealt with" in clause (ii). 285 U. S., at 208. Although the canon can be overcome by other textual indications of statutory meaning, the debtors point to none here. Pp. 3–8.

(b) None of the debtors' objections to this approach is valid. Pp. 8–9.

651 F. 3d 642, affirmed.

SCALIA, J., delivered the opinion of the Court, in which all other Members joined, except KENNEDY, J., who took no part in the decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports. Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 11–166

RADLAX GATEWAY HOTEL, LLC, ET AL., PETITION-
ERS *v.* AMALGAMATED BANK

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SEVENTH CIRCUIT

[May 29, 2012]

JUSTICE SCALIA delivered the opinion of the Court.

We consider whether a Chapter 11 bankruptcy plan may be confirmed over the objection of a secured creditor pursuant to 11 U. S. C. §1129(b)(2)(A) if the plan provides for the sale of collateral free and clear of the creditor's lien, but does not permit the creditor to "credit-bid" at the sale.

I

In 2007, petitioners RadLAX Gateway Hotel, LLC, and RadLAX Gateway Deck, LLC (hereinafter debtors), purchased the Radisson Hotel at Los Angeles International Airport, together with an adjacent lot on which the debtors planned to build a parking structure. To finance the purchase, the renovation of the hotel, and construction of the parking structure, the debtors obtained a $142 million loan from Longview Ultra Construction Loan Investment Fund, for which respondent Amalgamated Bank (hereinafter creditor or Bank) serves as trustee. The lenders obtained a blanket lien on all of the debtors' assets to secure the loan.

Completing the parking structure proved more expensive than anticipated, and within two years the debtors

had run out of funds and were forced to halt construction. By August 2009, they owed more than $120 million on the loan, with over $1 million in interest accruing every month and no prospect for obtaining additional funds to complete the project. Both debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

A Chapter 11 bankruptcy is implemented according to a "plan," typically proposed by the debtor, which divides claims against the debtor into separate "classes" and specifies the treatment each class will receive. See 11 U. S. C. §1123. Generally, a bankruptcy court may confirm a Chapter 11 plan only if each class of creditors affected by the plan consents. See §1129(a)(8). Section 1129(b) creates an exception to that general rule, permitting confirmation of nonconsensual plans—commonly known as "cramdown" plans—if "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." Section 1129(b)(2)(A), which we review in further depth below, establishes criteria for determining whether a cramdown plan is "fair and equitable" with respect to secured claims like the Bank's.

In 2010, the RadLAX debtors submitted a Chapter 11 plan to the United States Bankruptcy Court for the Northern District of Illinois. The plan proposed to dissolve the debtors and to sell substantially all of their assets pursuant to procedures set out in a contemporaneously filed "Sale and Bid Procedures Motion." Specifically, the debtors sought to auction their assets to the highest bidder, with the initial bid submitted by a "stalking horse"—a potential purchaser who was willing to make an advance bid of $47.5 million.[1] The sale proceeds would be used to fund the plan, primarily by repaying the Bank. Of course

--------

[1] In a later proposal, the stalking-horse bid increased to $55 million. The precise amount of the bid is not relevant here.

the Bank itself might wish to obtain the property if the alternative would be receiving auction proceeds that fall short of the property's full value. Under the debtors' proposed auction procedures, however, the Bank would not be permitted to bid for the property using the debt it is owed to offset the purchase price, a practice known as "credit-bidding." Instead, the Bank would be forced to bid cash. Correctly anticipating that the Bank would object to this arrangement, the debtors sought to confirm their plan under the cramdown provisions of §1129(b)(2)(A).

The Bankruptcy Court denied the debtors' Sale and Bid Procedures Motion, concluding that the proposed auction procedures did not comply with §1129(b)(2)(A)'s requirements for cramdown plans. *In re River Road Hotel Partners, LLC*, Case No. 09 B 30029 (ND Ill., Oct. 5, 2010), App. to Pet. for Cert. 40a. The Bankruptcy Court certified an appeal directly to the United States Court of Appeals for the Seventh Circuit. That court accepted the certification and affirmed, holding that §1129(b)(2)(A) does not permit debtors to sell an encumbered asset free and clear of a lien without permitting the lienholder to credit-bid. *River Road Hotel Partners, LLC, et al.* v. *Amalgamated Bank*, 651 F. 3d 642 (2011). We granted certiorari. 565 U. S. ___ (2011).

## II
### A

A Chapter 11 plan confirmed over the objection of a "class of secured claims" must meet one of three requirements in order to be deemed "fair and equitable" with respect to the nonconsenting creditor's claim. The plan must provide:

> "(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed

amount of such claims; and (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

"(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

"(iii) for the realization by such holders of the indubitable equivalent of such claims."   11 U. S. C. §1129(b)(2)(A).

Under clause (i), the secured creditor retains its lien on the property and receives deferred cash payments. Under clause (ii), the property is sold free and clear of the lien, "subject to section 363(k)," and the creditor receives a lien on the proceeds of the sale. Section 363(k), in turn, provides that "unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property"—*i.e.,* the creditor may credit-bid at the sale, up to the amount of its claim.[2]  Finally, under clause (iii), the plan provides the secured creditor with the "indubitable equivalent" of its claim.

---

[2]The ability to credit-bid helps to protect a creditor against the risk that its collateral will be sold at a depressed price. It enables the creditor to purchase the collateral for what it considers the fair market price (up to the amount of its security interest) without committing additional cash to protect the loan. That right is particularly important for the Federal Government, which is frequently a secured creditor in bankruptcy and which often lacks appropriations authority to throw good money after bad in a cash-only bankruptcy auction.

The debtors in this case have proposed to sell their property free and clear of the Bank's liens, and to repay the Bank using the sale proceeds—precisely, it would seem, the disposition contemplated by clause (ii). Yet since the debtors' proposed auction procedures do not permit the Bank to credit-bid, the proposed sale cannot satisfy the requirements of clause (ii).[3] Recognizing this problem, the debtors instead seek plan confirmation pursuant to clause (iii), which—unlike clause (ii)—does not expressly foreclose the possibility of a sale without credit-bidding. According to the debtors, their plan can satisfy clause (iii) by ultimately providing the Bank with the "indubitable equivalent" of its secured claim, in the form of cash generated by the auction.

We find the debtors' reading of §1129(b)(2)(A)—under which clause (iii) permits precisely what clause (ii) proscribes—to be hyperliteral and contrary to common sense. A well established canon of statutory interpretation succinctly captures the problem: "[I]t is a commonplace of statutory construction that the specific governs the general." *Morales* v. *Trans World Airlines, Inc.*, 504 U. S. 374, 384 (1992). That is particularly true where, as in §1129(b)(2)(A), "Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." *Varity Corp.* v. *Howe*, 516 U. S. 489, 519 (1996) (THOMAS, J., dissenting); see also *HCSC-Laundry* v. *United States*, 450 U. S. 1, 6 (1981) *(per curiam)* (the specific governs the general "particularly when the two are interrelated and closely positioned, both in fact being parts of [the same statutory scheme]").

The general/specific canon is perhaps most frequently

_____

[3] Title 11 U. S. C. §363(k)—and by extension clause (ii)—provides an exception to the credit-bidding requirement if "the court for cause orders otherwise." The Bankruptcy Court found that there was no "cause" to deny credit-bidding in this case, and the debtors have not appealed that disposition.

applied to statutes in which a general permission or prohibition is contradicted by a specific prohibition or permission. To eliminate the contradiction, the specific provision is construed as an exception to the general one. See, *e.g.*, *Morton* v. *Mancari*, 417 U. S. 535, 550–551 (1974). But the canon has full application as well to statutes such as the one here, in which a general authorization and a more limited, specific authorization exist side-by-side. There the canon avoids not contradiction but the superfluity of a specific provision that is swallowed by the general one, "violat[ing] the cardinal rule that, if possible, effect shall be given to every clause and part of a statute." *D. Ginsberg & Sons, Inc.* v. *Popkin*, 285 U. S. 204, 208 (1932). The terms of the specific authorization must be complied with. For example, in the last cited case a provision of the Bankruptcy Act prescribed in great detail the procedures governing the arrest and detention of bankrupts about to leave the district in order to avoid examination. The Court held that those prescriptions could not be avoided by relying upon a general provision of the Act authorizing bankruptcy courts to "'make such orders, issue such process, and enter such judgments in addition to those specifically provided for as may be necessary for the enforcement of the provisions of [the] Act.'" *Id.,* at 206 (quoting Bankruptcy Act of 1898, §2(15), 30 Stat. 546). The Court said that "[g]eneral language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part of the same enactment." 285 U. S., at 208. We recently quoted that language approvingly in *Bloate* v. *United States*, 559 U. S. ___, ___ (2010) (slip op., at 10). Or as we said in a much earlier case:

> "It is an old and familiar rule that, where there is, in the same statute, a particular enactment, and also a general one, which, in its most comprehensive sense,

would include what is embraced in the former, the particular enactment must be operative, and the general enactment must be taken to affect only such cases within its general language as are not within the provisions of the particular enactment. This rule applies wherever an act contains general provisions and also special ones upon a subject, which, standing alone, the general provisions would include." *United States* v. *Chase*, 135 U. S. 255, 260 (1890) (citations and internal quotation marks omitted).

Here, clause (ii) is a detailed provision that spells out the requirements for selling collateral free of liens, while clause (iii) is a broadly worded provision that says nothing about such a sale. The general/specific canon explains that the "general language" of clause (iii), "although broad enough to include it, will not be held to apply to a matter specifically dealt with" in clause (ii). *D. Ginsberg & Sons, Inc.*, *supra*, at 208.

Of course the general/specific canon is not an absolute rule, but is merely a strong indication of statutory meaning that can be overcome by textual indications that point in the other direction. The debtors point to no such indication here. One can conceive of a statutory scheme in which the specific provision embraced within a general one is not superfluous, because it creates a so-called safe harbor. The debtors effectively contend that that is the case here—clause (iii) ("indubitable equivalent") being the general rule, and clauses (i) and (ii) setting forth procedures that will always, *ipso facto*, establish an "indubitable equivalent," with no need for judicial evaluation. But the structure here would be a surpassingly strange manner of accomplishing that result—which would normally be achieved by setting forth the "indubitable equivalent" rule first (rather than last), and establishing the two safe harbors as provisos to that rule. The structure here sug-

gests, to the contrary, that (i) is the rule for plans under which the creditor's lien remains on the property, (ii) is the rule for plans under which the property is sold free and clear of the creditor's lien, and (iii) is a residual provision covering dispositions under all other plans—for example, one under which the creditor receives the property itself, the "indubitable equivalent" of its secured claim. Thus, debtors may not sell their property free of liens under §1129(b)(2)(A) without allowing lienholders to credit-bid, as required by clause (ii).

## B

None of the debtors' objections to this approach is valid.

The debtors' principal textual argument is that §1129(b)(2)(A) "unambiguously provides three distinct options for confirming a Chapter 11 plan over the objection of a secured creditor." Brief for Petitioners 15 (capitalization and bold typeface removed). With that much we agree; the three clauses of §1129(b)(2)(A) are connected by the disjunctive "or." The debtors contend that our interpretation of §1129(b)(2)(A) "transforms 'or' into 'and.'" Reply Brief for Petitioners 3. But that is not so. The question here is not whether debtors must comply with more than one clause, but rather which one of the three they must satisfy. Debtors seeking to sell their property free of liens under §1129(b)(2)(A) must satisfy the requirements of clause (ii), not the requirements of *both* clauses (ii) and (iii).

The debtors make several arguments against applying the general/specific canon. They contend that clause (ii) is no more specific than clause (iii), because the former provides a procedural protection to secured creditors (credit-bidding) while the latter provides a substantive protection (indubitable equivalence). As a result, they say, clause (ii) is not "a limiting subset" of clause (iii), which (according to their view) application of the general/specific

canon requires. Brief for Petitioners 30–31; Reply Brief for Petitioners 5–6. To begin with, we know of no authority for the proposition that the canon is confined to situations in which the entirety of the specific provision is a "subset" of the general one. When the conduct at issue falls within the scope of *both* provisions, the specific presumptively governs, whether or not the specific provision also applies to some conduct that falls outside the general. In any case, we think clause (ii) is entirely a subset. Clause (iii) applies to *all* cramdown plans, which include all of the plans within the more narrow category described in clause (ii).[4] That its requirements are "substantive" whereas clause (ii)'s are "procedural" is quite beside the point. What counts for application of the general/specific canon is not the *nature* of the provisions' prescriptions but their *scope.*

Finally, the debtors contend that the Court of Appeals conflated approval of bid procedures with plan confirmation. Brief for Petitioners 39. They claim the right to pursue their auction now, leaving it for the Bankruptcy Judge to determine, at the confirmation stage, whether the resulting plan (funded by auction proceeds) provides the Bank with the "indubitable equivalent" of its secured claim. Under our interpretation of §1129(b)(2)(A), however, that approach is simply a nonstarter. As a matter of law, no bid procedures like the ones proposed here *could* satisfy the requirements of §1129(b)(2)(A), and the distinction between approval of bid procedures and plan confirmation is therefore irrelevant.

───────────

[4] We are speaking here about whether clause (ii) is a subset for purposes of determining whether the canon applies. As we have described earlier, *after* applying the canon—*ex post*, so to speak—it ceases to be a subset, governing a situation to which clause (iii) will no longer be deemed applicable.

## III

The parties debate at some length the purposes of the Bankruptcy Code, pre-Code practices, and the merits of credit-bidding. To varying extents, some of those debates also occupied the attention of the Courts of Appeals that considered the question presented here. See, *e.g., In re Philadelphia Newspapers, LLC,* 599 F. 3d 298, 314–317 (CA3 2010); *id.,* at 331–337 (Ambro, J., dissenting). But nothing in the generalized statutory purpose of protecting secured creditors can overcome the specific manner of that protection which the text of §1129(b)(2)(A) contains. As for pre-Code practices, they can be relevant to the interpretation of an ambiguous text, but we find no textual ambiguity here. And the pros and cons of credit-bidding are for the consideration of Congress, not the courts.

The Bankruptcy Code standardizes an expansive (and sometimes unruly) area of law, and it is our obligation to interpret the Code clearly and predictably using well established principles of statutory construction. See *United States* v. *Ron Pair Enterprises, Inc.*, 489 U. S. 235, 240–241 (1989). Under that approach, this is an easy case. Because the RadLAX debtors may not obtain confirmation of a Chapter 11 cramdown plan that provides for the sale of collateral free and clear of the Bank's lien, but does not permit the Bank to credit-bid at the sale, we affirm the judgment of the Court of Appeals.

*It is so ordered.*

JUSTICE KENNEDY took no part in the decision of this case.